IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RACHEL MOORE AND MICHAEL MOORE, w/h, | : |
| | : |
| Plaintiffs, | : CIVIL ACTION |
| v. | : |
| | : NO. 13-2384 |
| GRAND VIEW HOSPITAL, ET AL., | : |
| | : |
| Defendants. | : |

**MEMORANDUM OPINION**

**Tucker, C.J.**                                                          **November 24, 2014**

Presently, before this Court is Defendant Grand View Hospital's ("Grand View") Motion for Partial Summary Judgment (Doc. 26), Plaintiffs Rachel Moore and Michael Moore's Response in Opposition (Doc. 27), and Defendant Grand View's Reply (Doc. 28). Upon consideration of the parties' briefs and exhibits, this Court will ***grant*** Defendant Grand View's Motion for Partial Summary Judgment.

**FACTUAL BACKGROUND**

The facts in this case are as follows. Mrs. Moore was 29 years old and pregnant with her first child when she was first seen at Defendant Stoneridge Obstetrics and Gynecology ("Stoneridge") in January 2012. She weighed 221 pounds and measured 5 feet 4 inches in height. Pls.' Am. Compl. ¶ 21. Her expected date of delivery was August 23, 2012.

For her final prenatal visit at 38 6/7 weeks' gestation on August 15, 2012, Mrs. Moore presented to Dr. Keren Hancock, her private obstetrician at Stoneridge. Id. at ¶ 36. Dr. Hancock recorded Mrs. Moore's blood pressure as 140/82. Id. at ¶ 38. Mrs. Moore's urine dipstick results showed a glucose level of 4+ and protein level of 2+. Id. at ¶ 39. Dr. Hancock sent Mrs. Moore

1

to Grand View's Labor and Delivery unit for additional testing, including a urinalysis, blood glucose check, non-stress test, serial blood pressure tests, and "preelcamptic [sic] panel if indicated after monitoring." Id. at ¶ 42.

Mrs. Moore arrived at Grand View at 11:45 a.m. on August 15, 2012. She was placed on electronic fetal monitoring from 11:50 a.m. to 3:28 p.m. Id. at 56; Def.'s Mot. for Partial Summ. J. at p. 5. At 11:56 a.m., Mrs. Moore's initial blood pressure reading was 135/88 mmHG. Pls.' Am. Compl. ¶ 43. Grand View continued to give Mrs. Moore serial blood pressure tests throughout her visit. Def.'s Mot. for Partial Summ. J. at p. 6. A urinalysis was performed at 12:00 p.m. and revealed trace protein, greater than or equal to 1,000 mg/dL of glucose, and trace ketonuria. Pls.' Am. Compl. ¶¶ 44-45. Later, at 12:24 p.m., Mrs. Moore's blood glucose level rose to 162 mg/dL. The obstetrical nurse attending to Mrs. Moore at the time, Debbie Collins, R.N., also indicated that Mrs. Moore had +2 pitting edema of both legs. Id. at ¶ 49.

Mrs. Moore's attending obstetrician at the time was Defendant Michael Chmielewski, M.D. Dr. Chmielewski reviewed the fetal monitor tracing at 2:33 p.m. Id. at ¶ 57. Nurse Collins recorded Dr. Chmielewski's interpretation of the fetal heart rate ("FHR") strip as manifesting minimal variability, absent accelerations, and late decelerations – consistent with Category II fetal status. Id. at ¶ 58. Dr. Chmielewski did not screen Mrs. Moore for preeclampsia, a pregnancy complication affecting both mother and fetus, which is characterized by high blood pressure and the presence of protein in the urine. Preeclampsia can lead to the death of a fetus and the only treatment for preeclampsia at term is delivery. Id. at ¶¶ 77-78.

The nurses assigned to Mrs. Moore changed shifts and Jayne Clemens, R.N., recorded that there was minimal variability of the FHR and no accelerations at 3:07 p.m. Id. at ¶ 60. At 3:12 p.m. Mrs. Moore's blood pressure was 123/71. Def.'s Mot. for Partial Summ. J. at p. 6.

After reviewing the fetal monitor tracing and other tests, Dr. Chmielewski approved Mrs. Moore's discharge at 3:23 p.m. Pls.' Am. Compl. ¶ 61. Mrs. Moore was discharged from Grand View at 3:30 p.m. Upon Mrs. Moore's discharge, Nurse Clemens recorded that the FHR evaluation was normal, with moderate variability, accelerations present, and decelerations absent. Id. at ¶ 63.

On August 17, 2012, Mrs. Moore returned to Grand View reporting that she had been contracting every two to three minutes. Id. at ¶ 65. On initial evaluation, no fetal heart tones were heard. Id. at ¶ 66. Additionally, a bedside ultrasound examination confirmed the absence of fetal cardiac activity consistent with intrauterine fetal demise occurring on or about August 17, 2012. Id. at ¶ 67. On August 18, 2012, Dr. Hancock delivered an eight pound, eight ounce stillborn baby girl. Id. at ¶ 72. An extensive battery of laboratory tests indicated that preeclampsia was the presumptive cause of baby girl Moore's death. Id. at ¶ 73.

Plaintiffs Mrs. Moore and Mr. Moore bring this action against Defendants Grand View Hospital, Dr. Michael Chmielewski, and Stoneridge Obstetrics and Gynecology, asserting the following causes of action: (1) medical negligence against all Defendants (Count I); (2) wrongful death against all Defendants (Count II); and (3) violation of the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, et seq., against Defendant Grand View (Count III). In its Motion for Partial Summary Judgment (Doc. 26), Grand View seeks to dismiss Plaintiffs' EMTALA claims.

## STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" issue exists where there is a "sufficient evidentiary basis on which a

reasonable jury could return a verdict for the non-moving party." Byrne v. Chester Cnty. Hosp., Civ. A. No. 09-889, 2012 WL 4108886, at *2 (E.D. Pa. Sept. 19, 2012) (citing Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)). "A factual dispute is 'material' if it might affect the outcome of the case under governing law." Id. All factual doubts should be resolved, and all reasonable inferences drawn, in favor of the nonmoving party. Torretti v. Main Line Hosp., Inc., 580 F.3d 168, 172 (3d Cir. 2009) (citing DL Res., Inc. v. FirstEnergy Solutions Corp., 506 F.3d 209, 216 (3d Cir. 2007)). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). The movant is responsible for "informing the court of the basis for its motion for summary judgment and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact." Byrne, 2012 WL 4108886, at *2 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

## DISCUSSION

Plaintiffs' Amended Complaint alleges that Grand View violated EMTALA by failing to screen Mrs. Moore for preeclampsia and failing to stabilize the known and documented non-reassuring FHR pattern, Mrs. Moore's gestational hypertension, and her carbohydrate intolerance on August 15, 2012. Pls.' Am. Compl. ¶¶ 116-17. Plaintiffs contend that Grand View's failure to screen and stabilize Mrs. Moore unreasonably placed Mrs. Moore's and baby girl Moore's health in peril. Id. at ¶¶ 118-19.

A. **Failure to Screen**

Congress enacted EMTALA in the mid-1980s to prevent hospitals from refusing to treat certain emergency room patients or transferring them to other institutions before the patients' emergency conditions were stabilized, a practice known as "patient dumping." See Torretti, 580 F.3d at 173. EMTALA requires hospitals to provide appropriate "medical screening and stabilizing treatment to individuals seeking emergency care in a nondiscriminatory manner." Id. Pursuant to the screening provision of EMTALA, for any individual who goes to a hospital emergency department seeking an examination or treatment, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition exists." 42 U.S.C. § 1395dd(a). Under EMTALA, an emergency medical condition is defined as

> a medical condition manifesting itself by acute symptoms of sufficient severity such that the absence of immediate medical attention could reasonably be expected to result in--
> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy . . . .

42 U.S.C. § 1396dd(e).

EMTALA does not define "appropriate medical screening," but circuit courts have "interpreted the statute as requiring hospitals to provide uniform screening 'to all those who present substantially similar complaints.'" Kauffman v. Franz, No. 07-5043, 2009 WL 3157333, at *2 (E.D. Pa. Sept. 24, 2009) (quoting Cruz-Queipo v. Hosp. Espanol Auxilio Mutuo de Puerto Rico, 417 F.3d 67, 70 (1st Cir. 2005)); see also Marshall v. E. Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 322 (5th Cir. 1998); Summers v. Baptist Med. Ctr. Akadelphia, 91 F.3d 1132, 1138 (8th Cir. 1996). Hospitals may develop their own screening procedures, but, pursuant to EMTALA, those procedures must be applied even-handedly to all patients. Kauffman, 2009 WL

5

3157333, at *2 (citing Summers, 91 F.3d at 1138 (8th Cir. 1996) ("It is up to the hospital itself to determine what its screening procedures will be. Having done so, it must apply them alike to all patients")); see also Byrne v. Cleveland Clinic, 684 F. Supp. 2d 641, 651 (E.D. Pa. 2010) ("The plain language of EMTALA requires a hospital to develop a screening procedure . . . and to apply that screening procedure *uniformly* to all patients with similar complaints").

Grand View has submitted to the Court, an affidavit from Kathleen Peca, R.N., the Director of Maternal & Child Health at Grand View. This affidavit sets forth Grand View's standard screening procedures for a patient presenting with the signs, symptoms and history with which Mrs. Moore presented on August 15, 2012, as follows:

> i. Assignment to an obstetrical nurse for nursing evaluation and observation;
> ii. Placement on a fetal monitor to continuously monitor the fetal heart rate and uterine contractions;
> iii. Serial blood pressures;
> iv. Fetal non-stress stress test;
> v. Urinalysis;
> vi. Blood Glucose Testing;
> vii. Evaluation by an obstetrician.
>
> Any further evaluation or testing beyond those steps outlined above are based on the exercise of independent medical judgment by the evaluating obstetrician of all the patient's signs and symptoms, including the results of the screening measures described above.

Def.'s Mot. for Partial Summ. J., Ex. C, Peca Aff. at ¶ 11.

The Court finds that the evidence presented in this case demonstrates that Grand View followed its standard screening procedures with respect to Mrs. Moore on August 15, 2012. Grand View promptly assigned Mrs. Moore to an obstetrical nurse, Nurse Collins, for evaluation and observation upon Mrs. Moore's arrival at the hospital. Mrs. Moore was then placed on electronic fetal monitoring from 11:50 a.m. to 3:28 p.m. for continual monitoring of the FHR and uterine contractions. Def.'s Mot. for Partial Summ. J., Ex. B. Serial blood pressures were taken throughout Mrs. Moore's visit at Grand View. See id. A urinalysis was performed at 12:00 p.m.

and Mrs. Moore's blood glucose level was tested at 12:20 p.m. See id. Additionally, beginning at 2:20 p.m., Dr. Chmielewski evaluated Mrs. Moore and reviewed the fetal monitor tracing and various tests that had been conducted on Mrs. Moore. See id. After reviewing the results of the screening, Dr. Chmielewski exercised his medical judgment and determined that Mrs. Moore did not present with an emergency condition and subsequently approved her discharge at 3:23 p.m. See id. The screening procedures that took place on August 15, 2012 in Mrs. Moore's case were consistent with those procedures Nurse Peca outlined as the standard hospital screening procedures for patients similarly situated to Mrs. Moore. See Def.'s Mot. for Partial Summ. J., Ex. C, Peca Aff. at ¶ 11.

Plaintiffs proffer evidence insufficient to support a finding that Mrs. Moore received disparate treatment or screening materially different than that provided to other similarly-situated patients at Grand View. In their Response in Opposition, Plaintiffs attempt to argue that Grand View *typically* performs a biophysical profile -- a non-invasive screening procedure involving an ultrasound and non-stress test intended to determine fetal health -- when presented with patients with nonreactive fetal monitor strips, such as Mrs. Moore. Plaintiffs rely on Nurse Collins's deposition where she testifies as follows:

> **Q**: Have you ever come across a situation where you had a nonreactive strip, meaning that there were no accelerations for the last 20 minutes or so and further evaluation in the form of a biophysical profile was done?
> **Nurse Collins**: Yes.
> **Q**: Okay. Is that *typically* what occurs in that scenario?
> **Nurse Collins**: Yes.
> **Q**: Did not occur in this case?
> **Nurse Collins**: Not while I took care of the patient.
> **Q**: Are you aware, from any source, of a biophysical profile being done or discussed at any point in time on the 15th of August?
> **Nurse Collins**: There was discussion.
> **Q**: Okay. Who was involved in that discussion?
> **Nurse Collins**: Myself and Sue Minio.
> **Q**: Tell me everything you remember about that discussion, please.

> **Nurse Collins**: When I talked to her about the tracing, we both had asked Dr. Chmielewski if he wanted to perform a biophysical profile.
> **Q**: And he said no?
> **Nurse Collins**: Yes, he said no.
> **Q**: Did he tell you why?
> **Nurse Collins**: He said that the baby was sleeping and that we would continue to observe her.

Pls.' Resp. in Opp'n, Ex. 1, Collins Dep. 74:14 – 75:19, Dec. 2, 2013 (emphasis added).

The Court deems this testimony insufficient to raise a material factual issue as to whether Mrs. Moore received differential treatment or screening at Grand View. Nurse Collins was not specifically asked about Grand View's screening protocols and how Mrs. Moore's screening may have deviated from Grand View's standard. Instead, Plaintiffs' counsel asked Nurse Collins a general question about what typically occurs in a hypothetical scenario. Counsel failed to elicit specific testimony regarding the baseline of care and procedures provided to patients like Mrs. Moore at Grand View. Other than this nonspecific statement from Nurse Collins, Plaintiffs have presented no evidence indicating the type of treatment Grand View offered other similarly-situated patients or how Grand View may have diverged from its screening protocol when caring for Mrs. Moore.

Plaintiffs challenge Dr. Chmielewski's medical judgment, asserting that he should have screened Mrs. Moore for preeclampsia. Plaintiffs' expert, James Tappan, M.D., argues that Dr. Chmielewski "failed to meet the standard of care expected of a physician holding himself out as a specialist in obstetrics and gynecology. . ." Def.'s Mot. for Partial Summ. J., Ex. F, p. 4. Dr. Tappan claims that Dr. Chmielewski should have pursued a diagnosis of preeclampsia when he saw that Dr. Hancock recorded that Mrs. Moore had an elevated blood pressure level of 140/82 and 2+ proteinuria prior to Mrs. Moore's admission to Grand View on August 15, 2012. Id. at p. 5. Dr. Tappan also asserts that Dr. Chmielewski should have ordered further testing, such as an

amniotic fluid index with a contraction stress test, a biophysical profile, or a modified biophysical profile when he observed the results of the FHR strip. Id. at p. 6-7. Dr. Tappan contends that Grand View and its staff failed to screen for life-threatening conditions affecting the fetus, including fetal hypoxia and acidemia when the FHR strip was non-reactive. Id. at p. 7.

Dr. Tappan's criticism of Dr. Chmielewski's medical judgment may offer support for a medical malpractice or negligence claim, but not for an EMTALA cause of action. EMTALA was not intended to create a federal medical malpractice cause of action or to cover cases of hospital negligence. See, e.g., Torretti, 580 F.3d at 173; Kaufmann, 2009 WL 3157333, at *2; Byrne, 684 F. Supp. 2d at 651. Accordingly, the issue under EMTALA "is not whether a physician *should have detected* an emergency condition, but whether a physician provides appropriate screening and stabilization for 'those conditions the physician *perceives* the patient to have.'" Kauffman, 2009 WL 3157333, at *2 (quoting Summers, 91 F.3d at 1139) (emphasis added); see also Marshall, 134 F.3d at 322-23 ("an EMTALA 'appropriate medical screening examination' is not judged by its proficiency in accurately diagnosing the patient's illness. . . . If the Hospital provided an appropriate medical screening examination, it is not liable under EMTALA even if the physician who performed the examination made a misdiagnosis. . . . a treating physician's failure to appreciate the extent of the patient's injury or illness, as well as subsequent failure to order an additional diagnostic procedure, may constitute negligence or malpractice, but cannot support an EMTALA claim for inappropriate screening"); Summers, 91 F.3d at 1138 ("Patients are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances . . . ."); Correa v. Hosp. San Francisco, 69 F.3d 1184, 1192-93 (1st Cir. 1995) ("faulty screening, in a particular case . . . does not contravene [EMTALA]"); Hardy v. New York City Health and Hosp. Corp., 164 F.3d 789, 792 (2d Cir. 1998) (EMTALA "was not

intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence"); Baber v. Hosp. Corp. of Am., 977 F.2d 872, 880 (4th Cir. 1992) ("The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care . . . ."). "It is not enough to proffer expert testimony as to what treatment *should* have been provided to a patient." See Reynolds v. Maine Gen. Health, 218 F.3d 78, 84 (1st Cir. 2000).

In the instant matter, Dr. Chmielewski has testified that he did not *perceive* Mrs. Moore as presenting with preeclampsia or any other medical emergency on August 15, 2012. In his deposition, Dr. Chmielewski testified that he ruled out preeclampsia because there was no significant proteinuria and Mrs. Moore's blood pressures were similar to those at baseline. Def.'s Mot. for Partial Summ. J., Ex. D, Chmielewski Dep. 83:3-11, Oct. 28, 2013. Dr. Chmielewski also disputed Nurse Collins's entries on Mrs. Moore's medical log, stating that he disagreed with Nurse Collins's assessment of the fetal monitoring strip. Specifically, Dr. Chmielewski disagreed that Mrs. Moore's fetal monitoring tracings depicted late decelerations, but instead believed that the tracings showed a period of decreased variability associated with fetal sleep. Id. at 107:14 – 108:9. In her deposition, Nurse Collins also confirmed Dr. Chmielewski's understanding that the strip depicted a period of fetal sleep and not a late deceleration. See Pls.' Resp. in Opp'n, Ex. 1, Collins Dep. 34:11-14; 68:19-21; 75:17-18, Dec. 2, 2013. Additionally, Dr. Chmielewski interpreted the fetal monitoring strip to have shown that there was a reactive window with accelerations. Def.'s Mot. for Partial Summ. J., Ex. D, Chmielewski Dep. 108:3 – 110:15, Oct. 28, 2013. In accordance with his reading of the fetal strip, Dr. Chmielewski exercised his medical judgment and decided not to order additional tests, such as a contraction stress test or biophysical profile, because he did not believe the tests were necessary. See id. at 115:13-20.

Plaintiffs may challenge the accuracy of Dr. Chmielewski's medical judgment in a state medical malpractice claim, but not in a federal EMTALA cause of action. The evidence presented to the Court demonstrates that Dr. Chmielewski and Grand View performed medical screening on Mrs. Moore consistent with Dr. Chmielewski *perception* of Mrs. Moore's medical condition at the time that she was admitted to Grand View. Although Dr. Chmielewski's perception of Mrs. Moore's medical condition might have been mistaken, his actions do not give rise to an EMTALA violation. Accordingly, there is no issue of material fact supporting an EMTALA cause of action for failure to appropriately screen.

### B. Failure to Stabilize

Plaintiffs also allege that Grand View failed to stabilize Mrs. Moore's emergency condition on August 15, 2012, thereby placing the health of both Mrs. Moore and her unborn child in peril. EMTALA requires that

> if any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—
>
> (A) Within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition . . . .

42 U.S.C. § 1395dd(b)(1). The term "to stabilize" is defined to mean,

> with respect to an emergency medical condition . . . to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . .

42 U.S.C. § 1395dd(e)(3)(A).

The Third Circuit has determined that in order to sustain an EMTALA stabilization claim, plaintiffs must show that they "(1) had 'an emergency medical condition; (2) the hospital *actually knew* of that condition; and (3) the patient was not stabilized before being transferred.'"

11

Torretti, 580 F.3d at 178 (quoting Baber, 977 F.2d at 883) (emphasis added). Accordingly, for an EMTALA stabilization claim, plaintiffs must demonstrate that the hospital had actual knowledge of the emergency condition. Hospitals cannot be held "accountable for failing to stabilize conditions of which they are not aware, or even conditions of which they should have been aware." Id. (quoting Vickers v. Nash Gen. Hosp., Inc., 78 F.3d 139, 145 (4th Cir. 1996)); see also Eberhardt v. City of Los Angeles, 62 F.3d 1253, 1259 (9th Cir. 1995) ("[T]he hospital's duty to stabilize the patient does not arise until the hospital first detects an emergency medical condition").

To support their EMTALA failure to stabilize claim, Plaintiffs offer Dr. Tappan's opinions about the attending nurses' failure to access the chain of command. Dr. Tappan opines:

> Grand View Hospital fell below the standard of care by failing to have a policy in effect that required perinatal nursing personnel . . . to access the chain of command when necessary to ensure their patients receive appropriate care. . . . Had the Grand View Hospital nurses accessed the chain of command and further fetal testing such as a [biophysical profile] been performed, fetal hypoxia would have been confirmed, and this would have led to a timely delivery before Baby Moore sustained injury. . . . Both nurses knew what needed to be done. . . . Yet neither nurse complied with their professional responsibilities to ensure their patients' welfare.

Def.'s Mot. for Partial Summ. J., Ex. F, p. 7.

Dr. Tappan's opinions, however, sound in medical malpractice or negligence; they do not support an EMTALA stabilization claim. The record presented in this case does not support a finding that anyone at Grand View believed or had actual knowledge that Mrs. Moore presented with a medical emergency on August 15, 2012. Both Dr. Chmielewski and Nurse Collins testified that they continued observing Mrs. Moore to view a change in variability in the fetal monitoring tracing. See Def.'s Mot. for Partial Summ. J., Ex. D, Chmielewski Dep. 108:4-9, Oct.

28, 2013; Pls.' Resp. in Opp'n, Ex. 1, Collins Dep. 74:9-13, Dec. 2, 2013. Dr. Chmielewski discharged Mrs. Moore after he was satisfied with the results of the testing performed on her.

The Court will dismiss Plaintiffs' EMTALA stabilization claim. After having screened Mrs. Moore on August 15, 2012, Dr. Chmielewski determined that Mrs. Moore did not present with preeclampsia or any other emergency medical condition. See Def.'s Mot. for Partial Summ. J., Ex. D, Chmielewski Dep. 83:3-11, Oct. 28, 2013. Consequently, Grand View did not have a duty under EMTALA to stabilize Mrs. Moore's undetected medical condition prior to discharging her.

### C. State Law Claims

In addition to the federal EMTALA claim against Grand View, Plaintiffs' Amended Complaint contains state law claims for medical negligence and wrongful death against all Defendants. Because the only claim over which the Court had original jurisdiction has been dismissed, the Court has limited discretion as to whether or not certain claims arising under supplemental jurisdiction should remain in federal court. See Ohad Assoc. v. Twp. of Marlboro, No. Civ. A. 10-2183, 2010 WL 3326674, at *5 (D.N.J. Aug. 23, 2010). Pursuant to 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction[.]" The Third Circuit has held that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." Ashton v. City of Uniontown, 459 F. App'x 185, 191 (3d Cir. 2012) (quoting Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir.1995)).

Here, federal jurisdiction is based upon Plaintiffs' EMTALA, 42 U.S.C. § 1395dd, claims. Because these claims are dismissed there is no viable federal claim remaining in Plaintiffs' Amended Complaint. Plaintiffs have not alleged any facts to demonstrate judicial economy, convenience, and fairness to the parties that support litigating the remaining state law claims in federal court. Id. Accordingly, the Court declines to exercise supplemental jurisdiction over the state law claims.

## CONCLUSION

For the foregoing reasons, the Court grants Defendant Grand View Hospital's Motion for Partial Summary Judgment in regards to Plaintiffs' EMTALA claims. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. An appropriate order follows.